# CIRCUIT COURT OF AUGUSTA COUNTY

Commonwealth of Virginia

v.

Tracy Wayne Claytor

January 17, 2013

Case No. CR12000246-00

BY JUDGE VICTOR V. LUDWIG

The Court heard this matter on January 10, 2012, on the Motion *in Limine* (the Motion) filed by the Commonwealth. For the reasons incompletely articulated at the hearing and amplified in this letter opinion, the Court sustains the Motion and, by this letter, details specifically what evidence will be inadmissible.

For the purposes of this opinion, the Court accepts as facts (a) that the defendant, Tracy Wayne Claytor, was declared an habitual offender by order of May 13, 1999, (b) that Claytor filed a petition for restoration of his license pursuant to Va. Code § 46.2-360.1, in which petition he acknowledged his status as an habitual offender, (c) that this Court entered an order on September 21, 2011 (the Order), restoring his privilege to operate a motor vehicle on a restricted basis, specifying some conditions, and noting that "the violation of these conditions would be a ground for vacating this Order and Petitioner reverting to habitual offender status," (d) that Claytor was stopped for operating a motor vehicle without an operator's license on October 21, 2011, and (e) that the General District Court granted him a restricted license on November 22, 2011. At the time of the stop, Claytor admitted to the deputy that he did not have an operator's license.

On April 23, 2012, Claytor was indicted for a violation of Va. Code § 46.2-357, which indictment alleges that, after being declared an habitual offender, on October 21, 2011, Claytor, for a second or subsequent time, operated a motor vehicle on the highways of the Commonwealth.

Va. Code § 46.2-357(A) provides, in part:

> It shall be unlawful for any person determined or adjudicated an habitual offender to drive any motor vehicle or self-propelled machinery or equipment on the highways of the Commonwealth while the revocation of the person's driving privilege remains in effect.

Anticipating the mischief created by the unartful phrase in the order, "the violation of these conditions would be a ground [for] . . . Petitioner reverting to habitual offender status," the Commonwealth argued that "any evidence concerning [Claytor's] subjective belief about his status as a habitual offender . . . be excluded." Motion, [unnumbered] p. 4. Conceding, as it must, that an element of the offense is that Claytor was given notice that he had been declared an habitual offender, *Reed v. Commonwealth*, 15 Va. App. 467 (1992), the Commonwealth maintains that Claytor's specific knowledge of his status as an habitual offender at the time he operated the vehicle on October 21, 2011, is irrelevant, and evidence of it is inadmissible.

Claytor does not, and likely could not successfully, maintain that he did not receive notice of his being declared a habitual offender. As I noted, his petition for reinstatement contains an acknowledgement that he has been declared an habitual offender. Rather, he argues that the Order changed Claytor's status as an habitual offender or that the decision in *Reed* declares, or at least implies, that there is a *scienter* or *mens rea* element of the crime, requiring that he know, at the time of the commission of the act, that he was an habitual offender, and that the language in the Order, by necessary implication, altered Claytor's knowledge of his status, with the result that he had no *mens rea*. The success of either argument would mean that Claytor could not be found guilty of operating a motor vehicle after being declared an habitual offender, either because he was not or because he did not know that he was, leaving him exposed, presumably, only to operating a motor vehicle without a license.

## I. *Claytor's Status as a Habitual Offender*

Addressing first whether or not Claytor was, at the time of the offense, an habitual offender, the Court concludes that he was, regardless of any implication in the Order to the contrary. In *Commonwealth v. Norman*, 268 Va. 539 (2004), the Court addressed the issue "whether the order of the circuit court restoring Norman's privileges to operate a motor vehicle on the conditions that he fulfill certain requirements terminated his habitual offender status." *Id.* at 541. Norman, having been declared an habitual offender, petitioned the Court for relief, and, by order of December 20, 1999, the Court restored his privilege to operate a motor vehicle (but did not issue a restricted license) on the condition, *inter alia*, that Norman not use alcohol for a period of twelve months.

Despite Norman's having violated a term of the December order, by order of May 4, 2001, the Court "granted Norman a limited 'restricted permit to drive'," *id.* at 544, again, on conditions. Based on that order, on May 7, 2001, Norman received a restricted driver's license. On August 14, 2001, a deputy stopped Norman (for reasons not entirely clear) and determined that Norman was operating the vehicle in violation of the conditions of the restricted permit.

Norman argued that the order of December 20, 1999, restoring his privilege to drive and not requiring a restricted license, ended his status as an habitual offender and that his subsequent violation of the terms of that order did not cause "his status [to] revert back to that of an habitual offender." *Id.* at 545. The Court of Appeals disagreed, concluding that only an unconditional restoration of an offender's driving privileges would suffice to terminate the status of habitual offender.

> Our conclusion is consistent with the language of Code § 46.2-360(1). Under that statute, a circuit court may restore a habitual offender's privilege to operate a motor vehicle with or without conditions or issue a restricted license. By authorizing a circuit court to restore the privilege on whatever conditions the court may prescribe, the General Assembly did not intend for a restoration of driving privileges subject to court-imposed conditions to have the same legal effect as a restoration without any conditions. Obviously, when the conditions are fulfilled, a complete restoration is then effected. In contrast, if a circuit court chooses to issue a restricted license instead of restoring the privilege with conditions, that restricted license will never mature into a full restoration of driving privileges.

*Id.* at 547. Given that only an unconditional restoration of driving privileges can result in the termination of habitual offender status, it is clear that the Order, only restoring Claytor's privilege to operate a motor vehicle on a restricted basis, could not have had that effect, even if the Order had clearly purported to terminate that status. Hence, whatever he believed, Claytor was an habitual offender on October 21, 2011.

## II. *Claytor's State of Mind as to His Status*

With respect to the issue of Claytor's state of mind at the time he was operating a vehicle on October 21, 2011, the decision in *Reed* is a narrow one, the principle it announces is limited, and it is not a precedent for Claytor's argument. Although the Court addressed it no fewer than three times, the principle articulated remained the same throughout. In each instance, the focus was on whether or not Reed had received notice of his

status; the Court did not address the state of his knowledge at the time he operated a vehicle while in that status.

Initially, the Court held that "[a]n essential element of the offense of driving after having been declared an habitual offender is that the operator knew at the time he operated a motor vehicle in Virginia *that he was doing so after he had been declared an habitual offender* and ordered not to drive." *Id.* at 468 (emphasis added). The Court framed the issue before it in these terms: "The question is whether actual *personal notice that one has been declared an habitual offender* and ordered not to drive is required in order to obtain a criminal conviction under Code § 46.2-357." *Id.* at 470 (emphasis added). "[B]efore a person can be guilty of driving a vehicle 'while the order of the court prohibiting such operation remains in effect,' Va. Code § 46.2-355, requires *proof of actual knowledge that one has been declared to be an habitual offender* before one can be convicted of driving after having been so declared and ordered not to drive." *Id.* at 471 (emphasis added). Finally, noting a harmony with precedent, the Court observed that:

> Our holding that an element of the offense as defined by Code § 46.2-357 requires proof *of actual notice that one has been declared to be an habitual offender* and directed not to drive is further dictated by the Supreme Court's holding in *Bibb v. Commonwealth*, 212 Va. 249, 183 S.E.2d 732 (1971). *See also Plummer v. Commonwealth*, 13 Va. App. 13, 15, 408 S.E.2d 765, 766 (1991).

*Id.* at 472 (emphasis added).

Specifically with respect to *scienter* or *mens rea*, the Court in *Reed* noted that "courts of some states have held that . . . the crime is one of strict liability, not requiring proof of *scienter* or *mens rea* as an element." *Id.* at 471. Other courts "have rejected this approach . . . reasoning that . . . an adjudication of guilt of such a serious criminal offense requires proof of knowledge and intent." *Id.* Of the cases cited, the majority, including *Gregory v. State*, 717 P.2d 428 (Alaska App. 1986); *State v. Crotty*, 134 N.H. 706, 710-11 (1991); *State v. Finger*, 72 N.C. App. 569 (1985); *State v. Keihn*, 542 N.E.2d 963 (Ind. 1989); and *People v. Lesh*, 668 P.2d 1362 (Colo. 1983), require merely proper notice or actual notice of the revocation order. However, *State v. Jennings*, 150 Ariz. 90 (1986), requires actual knowledge of status. *Jennings* allows that notice can present a presumption of knowledge but that it is reversible error to exclude "evidence concerning [the defendant's] belief as to the status of his license." *Id.* at 94. Noting that Va. Code § 46.2-357 "does not expressly provide that the Commonwealth must prove *scienter* or *mens rea*," the Court found that the offender must "receive actual notice of having been declared an habitual offender and directed not to drive" before he could be convicted under that section. *Id.* at 472.

Because the Court observed that the statute does not specifically require proof of *mens rea,* one might argue that there is no such requirement and that the Court of Appeals declined to add one because it was properly disinclined to legislate into the statute a requirement as to which the General Assembly had remained silent. Moreover, one might argue that, by making the distinction between *mens rea* and actual notice of the declaration of habitual offender status, it was concluding that there is no requirement of *mens rea* beyond the defendant's receipt of actual notice. Still, in the context in which the comment was made, it could be that the Court was focused only on a defendant's knowledge, or presumed knowledge, of his having been declared an habitual offender by virtue of his receiving actual notice of that fact.

Even so, every statement by the Court in *Reed* regarding a knowledge, or a notice, requirement, including the statement specifically directed to *mens rea,* is directed to a defendant's having received notice of his status; none refers to his state of mind at the time of taking the action that gives rise to the alleged offense. Each iteration of the requirement of notice, or knowledge, speaks in a verb tense that belies that the Court is addressing a requirement of present knowledge. In every instance, of course, the defendant must actually be in habitual offender status, but given that:

1. The defendant must, at the time of the offensive operation of a vehicle, know that "he *had been declared* an habitual offender." *Id.* at 468. That is not a requirement that he know that he still is.

2. The issue is whether it is required that there be "actual personal notice that one *has been declared* an habitual offender." *Id.* at 470. The issue is not that the offender know what his status is; only that he know that he has been declared to be an habitual offender.

3. Before one can be convicted of a violation of the statute, there must be "proof of actual knowledge that one *has been declared* to be an habitual offender." *Id.* at 471. That is not a requirement that he know that he still is.

4. The *mens rea* requirement (if there is one as that term is commonly used) is satisfied when the offender has "receive[d] actual notice of *having been declared* an habitual offender." *Id.* at 472. That is not a requirement that he know that he still is.

Still, while the decision in *Reed* cannot be a precedent for his position, Claytor argues that the requirement that the Commonwealth give notice to the offender of his status gives rise to the necessary implication that he subjectively know that he continued to be burdened by that status at the time of the alleged offense and that his knowledge at the time of the offense is an element of the crime which the Commonwealth must prove. On that issue, it is the opinion of this Court, for the reasons I have described, that Claytor is wrong.

Without forecasting the result of a trial on the merits, I am absolutely confident that, if the outcome is adverse to Claytor, this case will go to the Court of Appeals on the issue of the state of Claytor's knowledge of his

status at the time he drove the vehicle on October 21, 2011. Hence, I want to address an issue that was bracketed at the hearing, and that is the issue of Claytor's reliance of the language of the Order as a defense.

I say that the issue was bracketed (with rounds landing around it but not impacting directly). More accurately, perhaps, I observe that Claytor did not specifically raise a Constitutional argument which is the issue I will shortly address, but it may be that a reviewing Court could conclude that the issue was sufficiently broached to have been preserved.

At the hearing on the Motion, when the Court, in attempting to understand the nature of the issue, characterized it as a defense, Claytor vigorously maintained that it was not a defense, on which he would have the burden, but solely an element of the crime, leaving the burden of proof squarely on the Commonwealth. On that issue as well, it is the opinion of this Court that Claytor is wrong.

At the hearing, we did discuss the doctrine that ignorance of the law is no excuse, and Claytor argued generally that that maxim must be tempered by a notion of fairness because he was misled by the language of the Order. In fact, although cosmic fairness may not be the guiding star on the question, the Due Process Clause of the Fourteenth Amendment, and its implication of fairness, is.

> Reflecting the axiom that everyone is "presumed to know the law," the common law rule that "ignorance of the law is no excuse" admitted of few exceptions. The common law position was based on the fact that most common law crimes were *malum in se*. Seen as "inherently and essentially evil . . . without any regard to the fact of [their] being noticed or punished by the law of the state," *Black's Law Dictionary* 959 (6th ed. 1990), ignorance of the prohibition of such crimes was simply untenable. . . .

> Nonetheless, "with 'the increasing complexity of law, the multiplication of crimes *mala prohibita*, and a more exact definition of fundamental principles of criminal liability,' certain exceptions to the general rule have emerged.". . .

> The exception at issue addresses the legal consequences of a violation of the criminal law by an individual who takes measures to learn what conduct the government has proscribed, but is misadvised by the government itself.

*Miller v. Commonwealth*, 25 Va. App. 727, 731-32 (1997) (citations omitted). In that case, the Court recognized that the Due Process argument is that:

"the criminal statute under which the defendant is being prosecuted cannot constitutionally be applied to the defendant without violating due process of law, where government officials have misled the defendant into believing that his conduct was not prohibited." *Ghent, supra*, at 1031 [Jeffrey F. Ghent, Annotation, Criminal Law: *"Official Statement" Mistake of Law Defense*, 89 A.L.R.4th 1026 (1991)]; *see also Studifin*, 504 N.Y.S.2d at 610 ("For the state to prosecute someone for innocently acting upon such mistaken advice is akin to throwing water on a man and arresting him because he's wet.")

*Id.* at 736. The inquiry is "whether a defendant's conviction, for reasonably and in good faith doing that which he was told he could do, is fundamentally unfair in light of the content of the information he received and its source." *Id.* at 737. In *Branch v. Commonwealth*, 42 Va. App. 665 (2004), the Court most succinctly described the requirements for the defense.

[T]he defense is available if the defendant proves: (1) that he was assured that the conduct giving rise to the conviction was lawful; (2) that the assurance was given by a "government official," *i.e.*, "a public officer or body charged by law with responsibility for defining permissible conduct with respect to the offense at issue"; and (3) that, based on the totality of the circumstances, reliance upon the advice was reasonable and in good faith.

*Id.* at 671. As to the mechanics of the implementation of the defense:

The application of the defense then requires a factual determination whether the defendant's reliance upon the information received was reasonable and in good faith. The defendant bears the burden of establishing the affirmative defense. With respect to content, the defense is available only where the information upon which the defendant has relied is an affirmative assurance that the conduct giving rise to the conviction is lawful. In the absence of such an affirmative assurance, the due process concerns that the defense is designed to protect are not implicated, and the defense fails.

*Miller* at 737 (citations omitted).

Examining the elements of the defense, a dispositive question is whether the Order's language, that a "violation of [the conditions stated in the Order] would be a ground for . . . Petitioner reverting to habitual offender status," suffices as "an affirmative assurance that the conduct giving rise to the conviction was lawful." *Id.* I have no doubt that the Court,

speaking through its order, would satisfy the second consideration in that one could hardly argue that the Court is not an entity charged with the "responsibility for defining permissible conduct with respect to the offense at issue." Nevertheless, in light of the disposition of the first issue, I do not address the third. It is an issue of fact "whether the defendant's reliance on information was reasonable and in good faith," *id.*, and, therefore, one left to the jury. The predicate issue, however, of whether the implication of the Order is an "affirmative assurance," is arguably an issue of fact or arguably a mixed issue of fact and law.

However interpreted, as unartful as it is, the language on which Claytor relies is not framed as an assurance; it is not even a statement of fact or an assertion regarding Claytor's status, or any change in his status, as an habitual offender. To be sure, the statement is susceptible of an inference that, if one "reverts" to a condition, one is not in that condition, but to characterize that, or any similar, inference as an affirmative assurance is to eviscerate both the adjective and the noun of the phrase "affirmative assurance." An inference is not an assurance, much less an affirmative one. Assuming the issue to be one purely of fact, as with many issues of fact, there is a threshold which must be reached before the issue can be presented to a jury, and, in this case, the Court finds that a negative implication could not, by any reasonable jury, be construed to be an affirmative assurance.

### III. *Scope of the Limitation on Evidence*

Having addressed the merits of the matter, what remains is to detail what evidence is to be excluded. The Commonwealth asked that:

> [Claytor] and counsel refrain from referring to, introducing, or attempting to introduce any evidence pertaining in any way to a belief by the accused as to his status as a habitual offender, whether before or after the date of this offense, including, in particular, the finding that his privilege to operate a motor vehicle was restored on a restricted basis by this court's order of September 21, 2011, or that he received a restricted driver's license from the Augusta County General District Court on November 22, 2011, or that he obtained an operator's license from the Department of Motor Vehicles on November 22, 2012.

Motion, [unnumbered] pp. 6-7.

That language is too broad for the purpose. The Court agrees that Claytor may not introduce evidence of his subjective belief whether he was (or, more specifically, was not) an habitual offender. Assuming it to be relevant for other purposes, however, the Court will not suppress evidence regarding (a) his application for a restricted operator's license in Case No. CL11000744-00 or (b) that the Court entered an order restoring his privilege to operate

a motor vehicle on a restricted basis by the Order. Moreover, assuming that there is evidence to support the propositions and assuming them to be relevant for other purposes, the Court will not exclude evidence (c) that Claytor received a restricted driver's license from the Augusta County General District Court on November 22, 2011, or (d) that he obtained an operator's license from the Department of Motor Vehicles on November 22, 2011. What Claytor may not do, however, is opine or argue that, based on that evidence, he was unaware that he was an habitual offender.

The Court's decision is predicated on the fact that Claytor's state of mind at the time he was operating the vehicle which gives rise to the indictment is irrelevant unless that state of mind gives rise to a constitutional issue, and the Court has concluded that it does not. Hence, introduction of evidence that he did not believe that he was in habitual offender status would be properly objectionable at trial, and the Motion, like any proper motion *in limine*, does no more than anticipate the issue in a way that will preclude the jury's deliberations from being tainted by irrelevant information.